## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **SONJA LYNN S.,** | |
| **Plaintiff,** | **8:24CV14** |
| **vs.** | |
| **FRANK BISIGNANO, Commissioner of Social Security,** | **FINDINGS AND RECOMMENDATION** |
| **Defendant.** | |

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final administrative decision of the Commissioner of Social Security ("Commissioner"). Plaintiff has filed a Motion for Order Reversing Decision of the Commissioner (Filing No. 13). The Commissioner filed a Motion to Affirm Commissioner's Decision (Filing No. 18). The matter was referred to the undersigned magistrate judge to issue a Findings and Recommendation pursuant to 28 U.S.C. § 636 by the Honorable John M. Gerrard, Senior United States District Court Judge. Being fully advised in the premises, the undersigned magistrate judge finds and recommends that Plaintiff's motion to reverse and remand be denied, and that the Commissioner's motion to affirm be granted.

### PROCEDURAL BACKGROUND

On May 19, 2021, Plaintiff protectively filed a Title XVI application for supplemental social security income ("SSI"), and on May 27, 2021, she filed a Title II application for disabled widow's benefits ("DWB"). In both applications, Plaintiff alleges disability beginning May 18, 2021. The claims were denied initially, and upon reconsideration on April 15, 2022. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on May 4, 2022. (Filing No. 8-2 at pp. 19-20; Filing No. 8-5 at pp. 2-16). Plaintiff and her counsel appeared for a telephone hearing before the ALJ on January 9, 2023. (Filing No. 8-2 at pp. 38-62). On February 6, 2023, the ALJ issued an unfavorable decision. (Filing No. 8-2 at p. 19-30). The Appeals Council rejected Plaintiff's request for review. (Filing No. 8-2 at pp. 2-4). Plaintiff timely filed this action for review of the decision of the ALJ's decision on January 15, 2024. (Filing No. 1).

## FACTUAL BACKGROUND AND MEDICAL EVIDENCE

Plaintiff was born in July 1963 and was fifty-seven years old on her alleged onset date. Plaintiff has a high school education and previously worked as a fast-food worker. In her applications, Plaintiff claims disability due to chronic idiopathic urticaria. Plaintiff also has a history of degenerative disk disease, left hip bursitis, mental health diagnoses including PTSD, somatic symptom disorder, anxiety, and histrionic personality disorder. (Filing No. 8-2 at pp. 42-43).

Plaintiff's medical records are fairly voluminous, as she frequently seeks treatment for her perceived allergic reactions and other physical ailments. Beginning on February 13, 2021, Plaintiff reported to the Emergency Department (ED) for difficulty swallowing and "hives in throat" after potential exposure to shrimp the night before. Plaintiff was noted to have a history of anxiety and depression. The physical exam found no evidence of anaphylactoid or anaphylaxis type reaction, or of airway compromise. During this visit, Plaintiff started to become very upset due to her dry mouth and "began to yell and got up out of the bed." The ED physician "explained [to] her that I would give her a moment to relax and calm down," but Plaintiff "took her blood pressure cuff off and threw [it] on the ground." The ED physician "explained to her that assaulting a healthcare worker is against the law," after which Plaintiff "left without further discussion." (Filing No. 9-1 at pp. 97-99). Plaintiff had reported to the ED earlier that same month, complaining of a reaction to eating a McRib sandwich. The treating physician noted Plaintiff's described symptoms were "not the typical symptoms that I have seen in my career related to allergic reactions" and her lab work was "all unremarkable clinically." Plaintiff stated she is "allergic to normal saline which is virtually unheard of and that her allergist 'fired' her or washed his hands of her," which the physician found "puzzling." (Filing No. 9-1 at pp. 99-100).

On February 18, 2021, Plaintiff again reported to the ED, concerned she had an allergic reaction to eating pizza. The treatment note indicates Plaintiff has "[b]een seen in the emergency department several times with similar scenarios" and she was treated with antihistamines and Prednisone. Plaintiff had no physical signs or symptoms other than a dry mouth to suggest an allergic reaction. Plaintiff reported her "allergies were under control for several years while she was taking care of her husband and she believes that she was absorbing some of his chemotherapy that he was receiving for his cancer treatment and this is what was controlling her allergies." The

treating physician "suggested to her that some of the symptoms may be anxiety or grief related to the death of her husband" but Plaintiff "strongly disagreed." (Filing No. 9-1 at pp. 96-97).

Plaintiff saw her primary care provider, Dr. Like He, on February 21, 2021, stating she slipped on water during her shift at McDonald's and landed on her buttock/pelvic area and hit her left side forehead. Plaintiff stated her pain was "mostly in lower back/sacral area" and was observed using a cane during this appointment. (Filing No. 9-1 at p. 86).

Plaintiff went to the ED again on April 7, 2021, stating "her tongue has been swelling anytime she eats anything over the last week" and that Benadryl was not helping. Plaintiff reported suffering from allergies for "the last 30 years" and that even though she has been seeing an allergist and taking Benadryl 200mg at a time, she cannot get relief from her symptoms. Plaintiff claimed to be allergic to water and getting "hives and redness to her skin from anything she eats." She also reported prescription Hydroxyzine and Prednisone "make her worse and no better." The physical exam did not reflect "any specific signs or symptoms of allergic reaction" and Plaintiff's weight over the last 3 to 4 months was stable, despite her claimed food tolerances. The treating physician provided "a note for work until she can follow-up with her PCP." (Filing No. 9-1 at pp. 160-162).

On April 13, 2021, Plaintiff returned to Dr. He for a follow up after her April 7 ED visit. Plaintiff reported "extensive allergy to environmental allergens, great variety of foods, sometimes even water," but her physical exam in the ED was unremarkable with no evidence of anaphylaxis. Plaintiff was working overnight shifts at McDonald's, but stated everything she eats there causes an allergic reaction, and she is "severely allergic" to shellfish, which is used in some of the cooking oils required on the job. Dr. He noted Plaintiff's referral to Cheyenne for allergy testing showed no evidence of food allergy after a blood test. Plaintiff responded her "blood lies." Dr. He recommended starting Lexapro to help alleviate Plaintiff's stress and anxiety associated with her allergy, but Plaintiff declined, denying she has anxiety. Plaintiff was given an antihistamine and offered anxiety medication, but she declined the latter. (Filing No. 9-1 at pp. 93-94). On May 18, 2021, Dr. He referred Plaintiff to Dr. Vinay Mehta at Allergy, Asthma, & Immunity Assoc. for further evaluation. Plaintiff received her first Xolair injection on that date. (Filing No. 9-1 at pp. 92, 276).

On June 7, 2021, Plaintiff went to the ED reporting her "allergies flared up" and she "ha[d] pain and burning in her hands" after mowing the lawn. Plaintiff left the ED AMA because she was "frustrated with the wait time." (Filing No. 9-1 at pp. 254). Plaintiff followed up with Dr. He

the following day, on June 8, 2021. Plaintiff stated she did not give herself an EpiPen injection because she does not "like the pain." Dr. He noted Plaintiff "has been battling with chronic idiopathic urticaria all her life, and her condition has been getting more difficult to manage." Dr. He noted Plaintiff "seems to be allergic to virtually everything environmental, foods, even water," but her previous blood allergy testing was negative and had "mildly elevated IgE." At this point, Plaintiff had been taking multiple oral antihistamines, Singulair daily, and a Xolair injection. Plaintiff also had an EpiPen and oral Prednisone available to be used as needed. Dr. He commented he was "not sure if she has true anaphylactic shock per history, since the patient could always drive 30 minutes to a few hours to ED without using EpiPen." (Filing No. 9-1 at pp. 92-93).

On June 11, 2021, Plaintiff had a telehealth appointment with Dr. Mehta at Allergy, Asthma, & Immunity Assoc. She reported the Xolair injection "worked great for the first two weeks" but she had recurrent symptoms for the past two weeks. Plaintiff reported she went to the ED on three occasions where she was treated with systemic corticosteroids and was dismissed home, and was "frustrated" with her local care. (Filing No. 9-1 at p. 279). Plaintiff followed up with Angela Moser, PA-C, at Allergy, Asthma, & Immunity Assoc. on June 16, 2021. Plaintiff reported going to the ED the prior week for "blotchy skin rash and swelling of both of her hands." Plaintiff believed the Xolair injection "caused her to have some decrease in attention span and memory" but felt it helped her symptoms for two weeks, so a second Xolair injection was administered. (Filing No. 9-1 at p. 276).

On June 24, 2021, Plaintiff went to the ED because she started getting bumps filled with fluid all over her legs, which she believed was caused by a recent Bactrim prescription for a UTI. Plaintiff reported having shortness of breath, which was helped with albuterol, and "generalized fatigue." Her physical examination did "not reveal any blistering lesions and there are no mucosal lesions" and her presentation did not present a severe pathology like anaphylaxis, but instead suggested a "minor skin reaction." The note on this date states Plaintiff "demonstrates episodic shaking relates to allergy medications Xolair and 'primal tremors.'" (Filing No. 9-1 at p. 231-233).

On July 13, 2021, Plaintiff visited Lindsey Groff, PA-C, at Allergy, Asthma, & Immunity Assoc. Plaintiff reported her hives had improved and that Allegra has been helpful, but did not feel like Loratadine end Cetirizine were effective. Plaintiff also stated the Hydroxyzine 50mg

"causes her to feel angry" but felt it was helping her hives, so she would like to keep using it. She also stated the Xolair injections were going well and thinks "they've made a big difference on the hives and itching." Plaintiff also stated the "Chlortabs have also been helpful." Plaintiff returned to the clinic shortly after taking her regular Hydroxyzine50mg and reported a change in mood and "mild chest pain," and was advised to go to the ER and discontinue the medication. (Filing No. 9-1 at p. 269).

By August 17, 2021, at a follow-up visit with Goff, Plaintiff reported "feeling miserable from her hives" and did not feel the Xolair was as helpful as it was before. Plaintiff stated that the prior day she took "2 Claritin, 2 Zyrtec, 6 Allegra, 4 Benadryl, methylprednisone 4mg, famotidine 40mg, Chlortab 8 tablets and still feels itchy and has hives today." She reported some nausea from the medications. (Filing No. 9-1 at p. 344).

On September 15, 2021, Plaintiff had a telehealth appointment with Dr. Mehta at Allergy, Asthma, & Immunity Assoc. Plaintiff reported being unable to tolerate cyclosporine, which caused "severe nausea and vomiting" and had concerns about "gingival hyperplasia." She also stated Xolair's effects only last two weeks, after which she has to use more methylprednisolone. Plaintiff also tried Montelukast, but discontinued it after abdominal cramping. Dr. Mehta noted he would seek permission from Nebraska Medicaid to allow Plaintiff Xolair 300mg every two weeks instead of the standard dose every four weeks. (Filing No. 9-1 at pp. 347-349). At Plaintiff's follow-up appointment on October 5, 2021, she reported increased itching and hives in the past 3-4 days following her September 19, 2021, Xolair injection. (Filing No. 9-1 at pp. 357-359). By November 3, 2021, Plaintiff was reporting that she did not feel the Xolair was lasting two weeks, and had just developed hives under her tongue after eating a pork chop. Plaintiff also did not like taking methylprednisolone because it makes her feel ill. Plaintiff reported taking Levocetlrizine and Cetirizine in the morning, and one Loratadine at bedtime, in addition to Chlorpheniramine 3 times a day. (Filing No. 9-1 at pp. 360-362),

Plaintiff visited the ED on September 10, 2021, for foot pain after "kick[ing] door out of frustration." She left after two and a half hours of waiting for treatment. (Filing No. 9-1 at p. 310). On October 1, 2021, Plaintiff began seeking treatment from Dr. He for her right foot pain and to get insurance coverage for medications prescribed by her doctor in Lincoln. (Filing No. 9-1 at pp. 429-431). Plaintiff returned to Dr. He on December 29, 2021, reporting abdominal pain/nausea after taking Methotrexate prescribed by her dermatologist, Dr. John Blomstedt. Dr. He started

Plaintiff on Prednisone with a taper to help to reduce acute inflammation.  Plaintiff returned to Dr. He for a follow-up on January 12, 2022, complaining of hip bursitis and piriformis pain.  At this appointment, Plaintiff reported having numerous medication and food allergies, right-sided buttock pain, piriformis syndrome, SI joint dysfunction and greater trochanteric bursitis.  Dr. He believed Plaintiff would benefit from physical therapy and nonpharmacological intervention, such as a Theragun and infrared therapy.  Plaintiff reported that physical therapy had "called her" but she did not set up an appointment, but she would like to do so.  (Filing No. 9-1 at pp. 425-426).

On January 12, 2022, at Plaintiff's follow-up with Groff at Allergy, Asthma, & Immunity Assoc., Plaintiff reported having "trouble with abdominal discomfort, gas, bloating, and 'hives' in the mouth."  (Filing No. 9-1 at p. 379).  Plaintiff stated she had gastrointestinal discomfort after eating "almost anything" but it was worse after eating "salty foods."  Plaintiff reported getting hives in her mouth after eating watermelon strawberry flavored gum.  Plaintiff has seen a dermatologist, but she has not had hives at those visits so no biopsies were taken to confirm the presence of hives.  Plaintiff "feels like her antihistamines aren't helping and Xolair is now only helpful for 4 days."  Her dermatologist had started Plaintiff on oral Methotrexate, but she did not tolerate it.  Plaintiff reported going to the ED three times in December for "allergic reactions," but she had normal vitals and her medications were not changed.  (Filing No. 9-1 at pp. 379-381).  Plaintiff underwent a skin biopsy on January 18, 2022; the findings were "somewhat non-specific but would be consistent with a late phase of urticaria."  (Filing No. 9-1 at p. 438).

On January 26, 2022, Plaintiff returned to Allergy, Asthma, & Immunity Assoc. for a follow-up with Moser.  Plaintiff stated she stopped all antihistamines due to chronic nausea and abdominal discomfort, and felt like she had more energy and her "brain back."  Although Plaintiff had been taking Xolair 300mg injections every two weeks, she reported "itching constantly" and did a "home patch test" with saline at home to see if she had a reaction to salt.  Moser observed photographs on Plaintiff's phone from this test, but it looked to Moser as if the erythema was "mostly where the tape was attached."  Moser's skin exam noted some erythema on Plaintiff's anterior upper chest and neck, a few "tiny" erythematous papules on her arms, and no hives or angioedema.  Moser noted Plaintiff could reasonably try adding oral antihistamines back as-needed to control symptoms, and observed that in the past Plaintiff has "taken the liberty of changing her medications on a frequent basis and sometimes taking very high doses of antihistamine beyond

what we have advised," which could increase adverse effects of those medications. (Filing No. 9-1 at pp. 382-384).

On February 3, 2022, Plaintiff attended a telehealth visit follow-up with Moser at Allergy, Asthma, & Immunity Assoc.  This visit notes that prior to this follow-up, on January 27, 2022, Plaintiff had called the office to report throat swelling and she restarted Fexofenadine 180mg and Famotidine 40mg.  Plaintiff called back on January 31, 2022, and stated the Famotidine was causing stomach pain.  Plaintiff reports being "allergic to" or not tolerating Loratadine, Hydroxyzine, Montelukast, and also reported multiple food allergies, but with negative results when tested.  Plaintiff reported having more trouble with voice hoarseness, "throat swelling" and GI symptoms of nausea, abdominal pain, constipation, which the provider was unsure "are truly related to any allergic type reaction or angioedema." (Filing No. 9-1 at pp. 385-387).

On February 16, 2022, Plaintiff went to the ED complaining she felt her throat starting to close five minutes after taking a bite of a Burger King sandwich the night before.  Plaintiff reported a history of allergies and anaphylaxis, but refuses to use an EpiPen because they hurt.  Plaintiff also did not take any antihistamines because she does not like taking them.  Plaintiff's physical exam and vital signs were normal.  She was given a dose of Benadryl and one dose of Solu-Medrol 125mg. (Filing No. 9-1 at pp. 461-463).

On February 17, 2022, Plaintiff attended a telehealth visit follow-up with Moser at Allergy, Asthma, & Immunity Assoc.  Plaintiff reported her visit to the ED the prior day.  Plaintiff reiterated her belief she is allergic to a long list of foods including most forms of meat, fish, as well as salt, and although she "has had specific IgE levels checked to multiple foods in the past with negative results," she does not believe these tests are accurate.  The skin biopsy through her dermatologist's office showed superficial perivascular dermatitis with rare eosinophils, which was felt to be "somewhat non-specific" but could be consistent with late urticarial changes.  Plaintiff continued to report "chronic voice hoarseness."  Moser described Plaintiff as a "difficult patient to work with" because "during the same visit she can alternate between pleasant conversation, tearfulness, and anger," and was not an accurate historian.  Moser did feel Plaintiff "has some degree of chronic urticaria and dermatographism," but did not think she had "multiple food allergies," although it "would be very difficult to convince her otherwise." (Filing No. 9-1 at pp. 388-390).  At a March 17, 2022, follow-up with Moser, Plaintiff reported continued self-administration of Xolair 300mg every two weeks, which she felt was helpful.  She had stopped all the other antihistamines.

Plaintiff had not required an ED visit or oral steroids for hives/throat discomfort/reactions since February 17, 2022.  (Filing No. 9-1 at pp. 391-393).

On April 8, 2022, Plaintiff saw Dr. He and "[b]ecame tearful in exam room," stating she has "increased memory loss, confusion and her right side of mouth is drooping for past 9 months," and also complained she had weakness in her grip and "issues with knowing when she needs to urinate."  Dr. He noted Plaintiff started on "empirical ciprofloxacin due to patient's ongoing positive symptoms [of a kidney infection]" a few days prior, but Plaintiff reported "side effect/allergy, . . . projectile vomiting and skin rashes after taking first dose of ciprofloxacin (she just finished a course of ciprofloxacin 1 month ago)."  His physical exam noticed slight facial asymmetry, and Dr. He recommended a brain MRI to confirm a diagnosis of possible stroke. Dr. He stated Plaintiff "needs to be on antiplatelet, however, the patient reports having aspirin allergy," and Plaintiff declined Plavix. (Filing No. 9-1 at pp. 484-486).

On April 10, 2022, Plaintiff went to the ED complaining of "dizziness and chest discomfort since last May." A CT brain/head scan showed no acute territorial infarction, acute intracranial hemorrhage or mass lesion.  Plaintiff's initial and repeat troponin were negative, and there was no radiographic evidence for acute cardiopulmonary disease.  The treating physician encouraged Plaintiff to follow-up with her regular physician.  (Filing No. 9-1 at pp. 447-448, 454-456).

At Plaintiff's April 20, 2022, follow-up with Moser, Plaintiff "was visibly agitated and would often become upset, tearful, or start yelling" in response to questions.  Plaintiff reported she was "not doing too good" and has hives "constantly."  She was still "strongly convinced that she is allergic to most, if not all, foods including salt in any form."  Plaintiff reported taking a Medrol tablet and antihistamine (Fexofenadine, Levocetirizine) after most meals, but was worried those two medications will either become ineffective or she will develop an allergy to them.  Plaintiff stated she "can't take many medications because they contain corn or wheat derivatives."  Despite previously claiming to have an aspirin allergy, at this visit she reported being on aspirin 81 mg daily.  Plaintiff reported she had been vomiting intermittently, had chest tightness or throat tightness, dizziness, changes in vision, and difficulty concentrating.  Plaintiff also reported having a "lopsided smile" and "mention[ed] a possible diagnosis of Bell's Palsy" but was also concerned about "ministrokes from Xolair."  Plaintiff stated she had been to the hospital "several times" in the past month and had a chest CT, EKG, and lab work, all of which were normal.  Moser described this visit as "not very productive" because Plaintiff was so agitated and there was "no way to

convince her she is not allergic to all foods and salt," because she "does not believe the results of allergy tests even if we do them." Moser "encouraged her to talk to her PMD regarding mental health resources such as a therapist or psychologist/psychiatrist." (Filing No. 9-1 at pp. 405-407).

On May 11, 2022, Plaintiff saw Dr. He to discuss an MRI and "is wondering about Bell's Palsy." Plaintiff reported having "a lot of stress and anxiety" and states she has been having very high blood pressure readings at home. However, Plaintiff's blood pressure in the clinic was 100/80 and Plaintiff's physical exam was normal. (Filing No. 9-1 at pp. 491-492). On May 19, 2022, Plaintiff returned to discuss her blood pressure readings on her home machine, reporting "some of her home blood pressure readings showed a systolic pressure around 90s a few times." Plaintiff reported anxiety and depression symptoms and frustration "mainly related to not able to eat without getting a rash." Plaintiff states she has been diagnosed with PTSD and bipolar disorder in the past. Dr. He started Plaintiff on Propranolol targeting blood pressure goal under 130/80, which would also help her anxiety. (Filing No. 9-1 at pp. 503-504).

Plaintiff saw Dr. He on June 6, 2022, complaining of vertigo, difficulty concentrating, brain fog, and that her visual perception felt off. Plaintiff states these symptoms began when starting Propranolol for her blood pressure. Plaintiff reported her symptoms significantly improved after stopping the medication the day prior. Because Plaintiff "stopped [P]ropranolol yesterday and her blood pressure is 120/76 today," Dr. He commented he was "not sure if she actually needs blood pressure medications." While Plaintiff reports high blood pressure readings at home, in the last two years, Plaintiff only had mild elevation in 10% of the readings taken at the clinic. (Filing No. 9-1 at pp. 498-499).

At Plaintiff's June 21, 2022, follow-up with Groff, she reported that she has "trouble" with any foods that "come from water." Skin testing performed on this date showing negative reactions to shellfish, fish, and fruits. About 30 minutes after the testing Plaintiff developed several hives on her forearms and chest, which Moser suspected was "due to being off of her antihistamines and she was due for her Xolair injection." (Filing No. 9-1 at pp. 408-410).

Plaintiff saw Dr. He on June 23, 2022. Plaintiff stated she "had a negative skin test, however, she developed hives on her neck and extremities were she was not pricked." Plaintiff also asked to discuss "cooling assistance" as she "generally does not feel or respond well to warm/heat environment." Plaintiff also complained of chronic left wrist pain and paresthesia on left radial wrist with pain shooting to left thumb and thinks she "nicked the tendon" and asked for

a referral to Dr. Joshua Sole.  Dr. He found Plaintiff did not meet the criteria for cooling assistance.  ([Filing No. 9-1 at pp. 496-497](#)).

Plaintiff saw Dr. He on July 18, 2022, regarding neck pain from an injury she sustained in a storm on June 14, 2022.  Dr. He recommended an X-ray to rule out fractures, but was hesitant to start her on a new pain medication do to her "numerous allergies and intolerance to medications." ([Filing No. 9-1 at pp. 510-511](#)).  Plaintiff returned to Dr. He on July 25, 2022, regarding her "vocal chords," stating "her vocal strain came about from eating biscuits and gravy this morning."  Dr. He inserted a flexible fiberoptic scope into the nasal airway.  Dr. He's assessment was muscle tension dysphonia, conceivably from mild reflux.  Plaintiff had "just a little bit of asymmetry at the junction of the anterior one third posterior two thirds of her right cord consistent with a small nodule," which "does not seem to be playing a part in her strained voice which shows false cord overclosure and muscle action."  Dr. He suggested twice a day Omeprazole.  ([Filing No. 9-1 at pp. 514-515](#)).

At an August 1, 2022, follow-up with Dr. He, Plaintiff complained of neck pain, pain/numbness in her left thumb, and having issues with her allergies.  Plaintiff did "not feel her hives [were] under control." Dr. He referred her to immunology, where she was prescribed methylprednisolone to help with hives.  Plaintiff asked Dr. He to increase that dosage, but he declined and suggested she follow-up with her immunologist.  ([Filing No. 9-1 at pp. 508-509](#)).

At Plaintiff's August 1, 2022, follow-up with Moser, she stated she was "very frustrated" and had a "reaction all the time for the last 2 weeks," had a "rash all over" and felt her tongue and throat feel swollen.  Plaintiff also stated her skin is sore from constantly rubbing and itching. Plaintiff reportedly saw Dr. Massey for ENT evaluation of her throat/vocal cords on July 25, 2022, but "everything looked normal."  Plaintiff was prescribed a higher dose of Prednisone a month prior to this visit and stated her hives were better.  Moser recommended tapering Plaintiff down from Medrol, started a trial of Tacrolimus 1mg daily, and to continue Fexofenadine and Levocetirizine. ([Filing No. 9-1 at pp. 411-413](#)).

At Plaintiff's August 15, 2022, follow-up with Groff, Plaintiff reported feeling side effects from the Tacrolimus, increased fatigue, and says she feels like she "got hit by a Mack truck."  Groff discussed it may be from coming off of the methylprednisolone.  Plaintiff reported poor sleep, wheat cravings, feels like she "can't get full" and has constipation, and had not noticed an improvement in her hives.  Groff recommended discontinuing the Tacrolimus, to continue other

medications, and to take Benadryl as needed. (Filing no. 9-1 at pp. 413-416). Plaintiff followed up with Groff on September 13, 2022, and reported "[h]er hives have been flared up since last week" even though she has been taking Allegra, Levocetirizine, and Benadryl. Plaintiff also stated she "tries to stay off of the methylprednisolone" but ends up needing it every other day. Plaintiff felt the Xolair is only effective for about seven days. Plaintiff had a few small hives on her face but reported itching on her head, neck, and chest. Groff stated Plaintiff's "hives remain difficult to control," as she has been on high dose antihistamines and Xolair every two weeks, but cannot take cyclosporine or Tacrolimus due to side effects. Plaintiff did not have many hives on the exam but "she is very intolerant to the itch and she was scratching throughout the visit." (Filing No. 9-1 at pp. 416-419).

Plaintiff also received limited mental health treatment throughout the relevant period. On April 29, 2022, Plaintiff stopped by the office of a mental health counselor, Susan E. Martinez, to see if she had any appointments. Plaintiff was "loud, and she appeared very upset and frustrated," and stated she was trying to get on disability. (Filing No. 9-1 at p. 531). On May 13, 2022, Plaintiff had an initial individual psychotherapy appointment with Martinez. Plaintiff indicated her disability was an "inability to deal with stress." Plaintiff "indicated mood swings, eating disorder, grieving and anger as concerns," and her symptoms were feeling "annoyed/Irritated, lack of motivation, lack of concentration, social withdrawal, helplessness, unresolved grief, anger/temper, loss of appetite (at times), excessive appetite (at times), binge eating/purging, difficulty falling asleep, chronic illness or pain (stated as connected with arthritis), restlessness, poor grooming, and that she has been a victim of sexual, emotional, physical and emotional trauma." Plaintiff described "stress of dealing with food allergies, constantly feeling ill when she eats or does not eat, being allergic to salt among other things." Plaintiff stated she was in a controlling relationship with her husband until he died on March 29, 2020, and she was adjusting to being completely independent. Plaintiff reported past sexual abuse. Martinez's assessment was that Plaintiff met the medical necessity for mental health intervention due to Plaintiff's "severe symptoms of PTSD, and moderate anxiety," and determined a need to rule out bipolar disorder. Martinez recommended a minimum of weekly sessions. (Filing No. 9-1 at pp. 533-535).

On May 20, 2022, Plaintiff had another individual psychotherapy appointment with Martinez. Plaintiff's completion of assessments took "the majority of the session," and she stated she had a past diagnosis of ADD and was on Ritalin. Plaintiff stated her providers have had

"difficulty" determining the underlying causes of her allergies and that she only eats once a day. Plaintiff also reported abuse by her husband. Martinez noted Plaintiff's symptoms of PTSD were "in the severe range" and she had lingering guilt as to her husband's death. (Filing No. 9-1 at p. 537). Plaintiff scored 33 points on the Beck's Anxiety Inventory; scored 13 on Beck's Depression Inventory, which places her "below that of the mild range of depression"; and scored 73 on the PTSD checklist, which places her in the "severe" range of scoring. Martinez's treatment objectives included building a rapport and implementing at least five coping strategies to reduce anxiety and PTSD symptoms. (Filing No. 9-1 at p. 540).

At an individual psychotherapy appointment with Martinez on June 3, 2022, Plaintiff arrived as scheduled and "brought a crotchet project with her." During this session, Plaintiff "offered several statements that indicate delusions" and Martinez "experienced difficulty tracking [Plaintiff's] responses, frequently asking for clarification." (Filing No. 9-1 at p. 538). At Plaintiff's June 10, 2022, psychotherapy appointment, she shared her "life is in chaos" and provided a long narrative about helping a friend. Plaintiff became angry with Martinez during this appointment and left with a comment about how "she now understood why someone else had been unable to work with [Martinez]." (Filing No. 9-1 at p. 541). Plaintiff cancelled her next scheduled appointment, and the following week confirmed she had no plans to return for another session. (Filing No. 9-1 at pp. 546-547).

On August 17, 2022, Plaintiff underwent an in person mental health/substance use assessment by Anthony Hall, LADC, Mental Health counseling, at Cirrus House, Inc. (Filing No. 10-1 at p. 87). Plaintiff reported being allergic to "Pretty much everything. Even the sun somedays!" Plaintiff reported her other chronic medical issues such as sciatica, arthritis, and neck pain impact her activities of daily living (ADLs) and "somedays render her immobile and she cannot leave her house." (Filing No. 10-1 at pp. 87-88). Plaintiff reported current her mental health symptoms were "extreme frustration" and depression, which she has experienced throughout her life since birth "as it relates to various situations in her life and her medical struggles." Plaintiff stated she "is not on any medications" because she is allergic and "[t]hey didn't do shit." (Filing No. 10-1 at p. 89). Hall noted Plaintiff "demonstrated a tangential type of speech" and "[a]t times her mood appeared depressed as evidenced by her demeanor and teary disposition yet would often laugh at other times throughout the interview." Hall also noted Plaintiff's "thoughts were bizarre at times and would contradict herself by offering a set of

12

information and changing it later in the interview when asked to reiterate," which he noted "could have been due to some of the emotional dysregulation she demonstrated during the interview." Hall recommended "outpatient mental health counseling to help process the emotional dysregulation associated with her medical conditions." (Filing No. 10-1 at p. 91).

Thereafter, Plaintiff followed up at Cirrus House for weekly mental health counseling sessions in from September 7 to September 21, 2022, and then returned for fairly regular sessions from November 2, 2022, through January 4, 2023. (Filing No. 10-1 at pp. 92-110). During these sessions, Plaintiff reported "work [at the bakery] is going well [and] she is able to handle the number of hours they have her working." Plaintiff felt "she has a system to reduce the skin irritation from the nuts and corn syrup she works with." In December 2022, Plaintiff reported she received a "raise due to the quality of her work and her regular attendance," and was working "even though she has numerous physical problems and severe back injuries." (Filing No. 10-1 at pp. 103, 105). At a January 4, 2023, appointment, Plaintiff felt work was "going well," although she has had some conflicts and struggled with social interactions with younger people, such as calling one worker a "snot nosed kid." (Filing No. 10-1 at p. 107).

At a follow-up with Goff on October 11, 2022, Plaintiff stated she had just started working at a bakery, but reported the hot water and bleach she uses irritated her skin, requiring her to use methylprednisolone daily due to hives and itching on her hands. Plaintiff reported her itch had worsened due to her prescription for Fexofenadine changings from three times a day to twice a day. Plaintiff was still taking Levocetirizine 5mg twice a day, Xolair every two weeks, and Benadryl at night. Plaintiff reported hives on her abdomen the previous day. Although her hives had increased, she was excited for her new job. (Filing No. 9-1 at pp. 420-422).

Plaintiff saw Dr. He on October 19, 2022, complaining her vertigo symptoms were too hard to deal with while working. Plaintiff believes the bakery "kitchen is too warm causing her to have heat intolerance." Plaintiff "denies syncope, but did have some occasions that she had to hold onto something to steady herself." Dr. He started her on a trial of Meclizine for vertigo. (Filing No. 9-1 at pp. 506-507). In November 2022, Plaintiff began seeing Dr. Sole primarily for her left hand pain, but also complained of low back and pelvis pain. Dr. Sole "tr[ied] a thumb spica orthosis" but Plaintiff stated she could not wear it due to a nylon allergy. Dr. Sole ordered additional x-ray imaging, and recommended physical therapy, chiropractic and massage therapy, to consider use of walking aid, and to follow-up after six weeks of physical therapy. (Filing No.

10-1 at pp. 8-13).  Subsequent imaging showed no fractures or osteonecrosis, no significant degenerative changes in the sacroiliac joints or hips, "Multilevel degenerative facet joint disease, moderate in the lower lumbar spine," and no significant degenerative changes or acute bony abnormalities in her right shoulder.  (Filing No. 10-1 at pp. 60-62).  Plaintiff began physical therapy in December 2022.  During her December 9, 2022, session the physical therapist noted, "There is a lot of emotional overlay with this client."  (Filing No. 10-1 at pp. 69-70).

## OPINION EVIDENCE AND EVALUATIONS

Matthew Hutt, PhD, performed a psychological evaluation of Plaintiff on November 5, 2021.  (Filing No. 9-1 at p. 364).  Plaintiff reported to Dr. Hutt her last job was at McDonald's from November 2020 to March 2021.  Plaintiff reported she did not get "fired" from McDonald's, but quit because she "kept getting ill from allergies," she has problems with "panic and anxiety," and stress makes her "break out in hives."  Dr. Hutt noted Plaintiff was "an unwieldy individual with which to interview," "evidenced labile shifts in mood," and became more distraught and emotional as the interview continued.  (Filing No. 9-1 at pp. 364-365).  Plaintiff reported she has memory problems "[b]ecause the US government messed with my brain too much."  When Dr. Hutt followed up with queries for psychotic symptoms/delusional content, Plaintiff backtracked, stating she "was describing the general corruption in the government."  (Filing No. 9-1 at p. 367).  Dr. Hutt observed Plaintiff was "obstreperous" and was he "left with an impression that this is a rather difficult individual with which to associate and communicate."  (Id.).  Dr. Hutt noted Plaintiff's discourse "reflected a strong psycho-somatic preoccupation."  (Filing No. 9-1 at p. 368).  Dr. Hutt's diagnostic impressions included "Unspecified Somatic Symptom and Related Disorder" and "Histrionic Personality Disorder (primary diagnosis)."  (Filing No. 9-1 at p. 368).

Dr. Hutt opined Plaintiff's interpersonal functioning and social functioning "appear broadly and persistently impaired," and she has a "long history of emotional and behavioral disturbance" that would likely cause her to have "substantial coworker difficulties."  (Filing No. 9-1 at p. 369).  Dr. Hutt noted despite those challenges, Plaintiff's "attention and concentration skills appear largely intact"; she "enjoys completely intact intellectual capacities"; and is "likely capable of handling short, simple instruction sets under ordinary supervision"; but was impaired in her abilities to relate appropriately to coworkers and supervisors, which "along with her general social functioning, appears to be the most affected vocational domain."  Dr. Hutt also opined

Plaintiff's capacities to maintain punctual attendance, consistent work, and to relate appropriately and harmoniously with coworkers and supervisors appear substantially impaired. (Filing No. 9-1 at p. 369-70).

Dr. Hutt noted Plaintiff's "immediate activities of daily living appear broadly intact," she is able to "maintain self-care," she arrived "punctually and appropriately appointed" and had intact grooming and hygiene. Plaintiff brought a "large sack of crafts" and displayed a cross-stitch project that appeared to "reflect a careful and proficient seamstress." Plaintiff reported cooking and cleaning her own house without impairments, and can shop and complete normal community activities, although she acknowledges a general social avoidance. (Filing No. 9-1 at pp. 368-369).

The state agency psychological consultant opinion authored by Lee Branham, PhD, on December 1, 2021, notes Plaintiff's older medically determinable impairments, including PTSD and depressive disorder NOS, and Plaintiff's most current medically determinable impairments of somatic symptom disorder and personality disorder NOS with histrionic and narcissistic features. Dr. Branham stated, "current evidence does not show the symptom picture of PTSD," "[s]he may still have some symptoms of depression, and it is likely that her physical complaints are partially psychosomatic, but the primary medically determinable impairment is her personality disorder." (Filing No. 8-3 at p. 24). Plaintiff has a history of inpatient and outpatient care for depression in 2006 and 2007, and she is noted to have had an acute episode of depression or aggravated grief in response to stimuli reminding her of her husband's recent death. Observations by her doctors show no significant mental symptoms and records do not indicate significant suspicion of her physical symptoms being psychogenic. (Id.). Dr. Branham discussed Plaintiff's claimed allergic reactions "in the form of skin rashes, hives, itching, swelling of tongue, [shortness of breath] from most foods, water, grass, saline solution, etc.," but that there was "minimal objective evidence that supports the severity of her allegations." (Filing No. 8-3 at pp. 24-25). Dr. Branham opined there "may be some psych overlay to her physical issues, which has been suggested by providers previously." Plaintiff's symptoms "began flaring by her report shortly after her husband died," and she maintains a steady weight despite claiming she is allergic to most foods. Plaintiff has also not required hospitalization, which would be "likely" if her system was intolerant of water. (Filing No. 8-3 at p. 25).

Dr. Branham evaluated and reconciled prior medical opinions, including Dr. Hutt's. (Filing No. 8-3 at pp. 24, 40-41). While Dr. Branham found Dr. Hutt's opinion reasonable that

Plaintiff "may have conflicts at work and elsewhere," Dr. Banham "suggest[ed] the overall pattern of evidence is consistent with moderate work related limitations, as detailed on the MRFC." (Filing No. 8-3 at p. 24).

Dr. Branham found Plaintiff had one or more medically determinable impairments, including personality disorders, somatic symptom and related disorders, "Other Disorders of the Skin and Subcutaneous Tissues," among other severe impairments. He opined she had the following mental limitations: mild limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; mild limitation in concentrating, persistence, or maintaining pace; and moderate limitation in adapting or managing oneself. (Filing No. 8-3 at p. 26). He found Plaintiff's statements about the intensity, persistence, and functionally limiting effects of the symptoms were not substantiated by the objective medical evidence alone. (Filing No. 8-3 at p. 27).

The Mental Residual Functional Capacity ("MRFC") evaluation dated December 1, 2021, found Plaintiff's personality disorder and somatic symptom disorder lead to some difficulty in being present and punctual on a job, but were "not of a severity to prevent all work." Plaintiff's conditions "create some limitations in avoiding distractions by others, but she retains the ability to handle social interactions that are not too intense of conflictual." The MRFC concluded Plaintiff had no limitations in understanding and memory, was "not significantly limited" in her ability to carry out very short and simple instructions, there was "no evidence of limitation" in her ability to carry out detailed instructions, and was not significantly limited in her ability to maintain attention and concentration for extended periods. The MRFC found Plaintiff was "moderately limited" in the ability to interact appropriately with the general public, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to accept instructions and respond appropriately to criticism from supervisors. It noted "Her tolerance of stress and changes is reduced to some degree, but she is able to handle relatively well planned changes in an ordinary work setting." (Filing No. 8-3 at pp. 29-30). The agency consultant's review of Plaintiff's updated medical records through March 2022, and on April 15, 2022, noted Plaintiff "continues to face moderate MH limitations and no exertional limitations as outlined in the RFC/ MRFC" and that her "personality disorder and somatic symptom disorder lead to moderate functional limitations, as above." (Filing No. 8-3 at pp. 48-50).

**THE ALJ HEARING**

At the hearing before the ALJ on January 9, 2023, Plaintiff's counsel asserted that, in addition to Plaintiff's chronic idiopathic urticaria, Plaintiff also has a history of degenerative disk disease that affects her ability to stand and walk for long periods of time, left hip bursitis, mental health diagnoses including PTSD, somatic symptom disorder, anxiety, and histrionic personality disorder, and limitations in getting along with other people in any sort of workplace setting, thereby limiting her to "at best unskilled, sedentary work, where she would grid or in the alternative, she may grid at modified, unskilled, light work[.]" (Filing No. 8-2 at pp. 42-43).

Plaintiff testified she lives on her own and takes care of her own cooking, cleaning, laundry, and finances. (Filing No. 8-2 at pp. 51, 54). Plaintiff testified she had been working 20-25 hours a week at a bakery for the last four months, but that she is "on [her] cane" after a four hour work day. Plaintiff testified she avoids using her cane at work because she cannot carry pots and pans, but uses the cane at home "practically daily" and occasionally uses her late husband's walker. Plaintiff's job duties at the bakery include washing dishes, packaging, and lifting and taking food out of bread pans. (Filing No. 8-2 at pp. 43, 47-48, 53-54). Prior to her job at the bakery, Plaintiff worked at McDonald's, but testified she quit because she "was in an allergic reaction three-fourths of the time that I was there, as well as after," claiming she "was allergic to salt." (Filing No. 8-2 at p. 44). Plaintiff testified her "biggest issue" preventing her from working full time at the bakery is "being around people" because she does "not play well with others." (Filing No. 8-2 at p. 45). In addition to having difficulty being around people, Plaintiff believes she does not "deal with stress very well" and "shut[s] down when there's a lot of stress." Plaintiff testified "dealing with other people" and "depend[ing] on other people" are stressful for her. (Filing No. 8-2 at pp. 54-55).

Plaintiff also testified her sciatica, which she developed in 1998, interferes with her ability to stand or sit for very long, which would be her primary physical impediment to working full time at the bakery. *Id.* Plaintiff also testified the "biggest obstacle" to working at the bakery full time is her "back locking up" and "not being able to move my legs" and being unable to use a cane or walker on a slippery floor. (Filing No. 8-2 at p. 54). Plaintiff testified her sciatica gives her occasional issues with sleeping, but soaking in a hot tub helps. Plaintiff testified she is "allergic to metals" and "everything under the sun, including the sun," so she has not had treatment. Plaintiff testified she had started physical therapy for her back, but was having "problems" because she

may have a torn rotator cuff.  (Filing No. 8-2 at pp. 45-46).  Plaintiff also testified she has arthritis "throughout" her body and degenerative disc disease in the pelvic area.  (Filing No. 8-2 at p. 55). Plaintiff further testified she was having elbow pain and could "barely lift anything" with her right arm.  (Filing No. 8-2 at p. 56).

An impartial vocational expert, Julie Svec, testified at the administrative hearing.  The ALJ presented the following hypothetical to the vocational expert:

> I'd like you to assume a hypothetical person of the [Plaintiff's] same age, education, past work experience [no past relevant work]. Assume further an individual – let's start by saying no physical or exertional limitations. Mentally able -- would be able to perform simple and routine tasks. Could interact with coworkers occasionally. And should not interact with the public as part of her regular job duties. Would there be any -- why don't I say medium jobs, unskilled jobs, that would fit within that hypothetical?

(Filing No. 8-2 at p. 58).  The vocational expert testified that such an individual could work the following jobs: Cleaner (DOT 381.687-018, SVP 2, medium exertion level, approximately 200,000 jobs nationally); Laundry worker (DOT 361.684-010, SVP 2, medium exertion level, approximately 210,000 jobs nationally); and Dishwasher (DOT 318.687-010, SVP 2, medium exertion level, approximately 217,000 jobs nationally).  (Filing No. 8-2 at p. 59).  Those same jobs would still be available if a second hypothetical including medium exertion, frequently climb ramps and stairs, occasionally climb ladders, ropes, or scaffolds, and frequently balance, stoop, kneel, crouch, crawl were proffered.  (*Id.*).  Plaintiff objected she could not work as a cleaner because she is allergic to chemicals and cannot breathe around household cleaners.  (Filing No. 8-2 at pp. 60-61).

### THE ALJ's DECISION

The ALJ evaluated Plaintiff's claim using the "five-step" sequential analysis prescribed by the Social Security Regulations.[1]  See 20 C.F.R. §§ 404.1520(a) and 416.920(a).  The ALJ noted

---

[1] The Social Security Administration uses a five-step process to determine whether a claimant is disabled:

> At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is

the previous finding that Plaintiff is the unmarried widow of the deceased insured worker and she has attained the age of 50, and met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.  (Filing No. 8-2 at p. 21).  The ALJ found Plaintiff had not engaged in substantial gainful activity since May 18, 2021, the alleged onset date of disability.  The ALJ found Plaintiff has the following severe impairments: anxiety disorder, unspecified somatic symptom disorder, histrionic personality disorder, and degenerative disc disease of the lumbar spine, and that such medically determinable impairments significantly limit her ability to perform basic work activities as required by SSR 85-28.  The ALJ also noted the medical records reflect Plaintiff's additional impairments of obesity, left hip trochanteric bursitis, chronic idiopathic urticaria, right shoulder pain, and de quervains tenosynovitis, but found they were non-severe and have no more than a minimal effect on Plaintiff's ability to perform basic work activities because they are generally well-managed with conservative treatment.  The ALJ stated these non-severe impairments were taken into account when formulating Plaintiff's residual functioning capacity ("RFC").[2]   (Filing No. 8-2 at p. 22).

The ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  The ALJ found Plaintiff's physical impairments did not meet or medically equal the severity of a listed impairment.  The ALJ also found the severity of Plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Listings 12.04, 12.06, 12.07, 12.08, and 12.15 or any other applicable mental listing.  (Filing No. 8-2 at p. 22).

---

automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the RFC to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)).

[2] "'Residual functional capacity' is 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945).

With respect to Plaintiff's mental impairments, the ALJ considered whether the "paragraph B" criteria were satisfied. The ALJ found Plaintiff has a mild limitation in understanding, remembering or applying information. The ALJ noted that Plaintiff works part-time in a bakery and there is no objective evidence of memory, understanding, or cognitive deficits, and instead found Plaintiff's hearing testimony "emphasizes interaction problems." (Filing No. 8-2 at p. 23). The ALJ found Plaintiff has a moderate limitation in interacting with others, and "appears delusional, anxious, angry, and very emotional about her past and current problems." The ALJ pointed out evidence in the record that Plaintiff "sometimes appears visibly and irritated during medical appointments," was "unwieldy and emotional" in a psychological evaluation, and experiences emotional dysregulation. The ALJ found that, despite these issues, Plaintiff has maintained part-time work at a bakery, which she enjoys, and while she "struggles to have social interactions with the younger people," she "appears to do fine when she works by herself." (Filing No. 8-2 at p. 23). The ALJ found Plaintiff has a mild limitation with regard to concentrating, persisting or maintaining pace. The ALJ pointed to evidence that Plaintiff works 20-25 hours per week, does not allege concentration or pace problems, and "[t]here is little if any objective evidence of significant deficiencies with regard to memory, understanding, concentration, attention, or overall cognition." (Filing No. 8-2 at p. 23). The ALJ found Plaintiff has a moderate limitation in adapting or managing oneself, and has a "wide range of daily activity," works part-time in the bakery, cares for two dogs, prepares her own food, lives on her own, cares for her own laundry and household, drives, shops in stores, and spends time with friends." (Filing No. 8-2 at p. 23). The ALJ also considered whether the "paragraph C" criteria were satisfied, and determined they were not because Plaintiff lives independently and cares for her daily needs. (Filing No. 8-2 at p. 23).

Based upon the record, the ALJ found Plaintiff has the RFC to perform medium work as defined in 20 CFR §§ 404.1567(c) and 416.967(c), except she can occasionally climb ladders, ropes or scaffolds; she can frequently climb stairs or ramps, and frequently balance, stoop, kneel, crouch, and crawl; she "can perform simple and routine tasks"; she can interact with coworkers occasionally; and she "cannot interact with the public as part of her regular job duties." (Filing No. 8-2 at p. 24). The ALJ found Plaintiff's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms; however, her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the

medical evidence and other evidence in the record. *Id.* Specifically, the ALJ found Plaintiff's minimal work history with few lifetime earnings "calls into question her motivation to work well before the alleged onset date." The ALJ also noted that Plaintiff worked at McDonald's though 2021 and allegedly quit due to health concerns, but was nevertheless able to care for her ill husband for four years and also be a homemaker and raise children. (Filing No. 8-2 at pp. 24-25). The ALJ also took note of Plaintiff's testimony that she has "significant back issues and she is on her cane by the end of the day," but the medical record contained no evidence she was prescribed a cane, and her routine medical appointments do not reflect she was observed using an assistive device. Further, Plaintiff stated her back pain is debilitating, but the medical record reflects x-ray imaging showing only mild/moderate degenerative disc disease of the lumbar spine, and she has not received any "significant back treatment." (Filing No. 8-2 at p. 25).

The ALJ also recognized Plaintiff's claim that she has numerous allergies, and that she states she cannot have back treatment because she is allergic to metals; however, the ALJ stated that does not explain "why she has been unable to have pain management with injections or physical therapy." The ALJ noted Plaintiff had started physical therapy for her shoulder, although her testimony emphasized her back problems, and her musculoskeletal complaints were "intermittent and not consistent, and follow-up is not great." The ALJ also pointed out that while Plaintiff does not follow up with physical therapy, she finds Prednisone to be helpful for her back and hip pain. Plaintiff had complaints about back, shoulder, hip, and finger pain in November 2022, but had no imaging except for back x-rays, no injections, and no physical therapy. The ALJ stated Plaintiff's "lack of persistence in complaints and follow-up treatment suggests [her] symptoms are more manageable than she alleges." (Filing No. 8-2 at p. 25).

The ALJ concluded the medical record "fails to support [Plaintiff's] testimony that she has arthritis throughout her body," pointing to Plaintiff's x-rays showing no significant degenerative changes in SI joints or hips, mild to moderate degenerative disease of the lumbar spine, and no significant degenerative changes in her right shoulder. (Filing No. 8-2 at p. 25). The ALJ also considered that Plaintiff "performs fairly rigorous physical activity despite her back and other musculoskeletal concerns" because her job at the bakery requires washing dishes and packaging, and she lives on her own and performs "self-care, laundry, cooking, and shopping for herself." (Filing No. 8-2 at pp. 25-26).

The ALJ stated Plaintiff's physical treatments appear "largely focused on reports of allergies, although [Plaintiff's] providers do not seem to believe her reactions are related to allergies," and seem to attribute her symptoms to anxiety rather than an actual allergy. The ALJ nevertheless concluded Plaintiff's allergies "appear[ed] tolerable," and used the example that Plaintiff "claimed she could not continue work at McDonald's because of her allergy to salt, but she is currently working in a bakery 20-25 hours per week, which suggests an ability to be out in the workplace without debilitating allergic reactions." The ALJ also notes Plaintiff receives allergy injections, which "help and make a big difference," and she has normal vitals when she goes to the ER for "apparent allergic reactions." The ALJ also notes Plaintiff's reported allergy to "normal saline" is "virtually unheard of and 'puzzling' to doctors.'" (Filing No. 8-2 at p. 26). The ALJ recognizes the record contains "numerous references to allergies," but there is "little or no objective evidence supporting allergy to medications . . . and the reported allergies appear based more on subjective report." The ALJ also notes Plaintiff's allergy episodes do not appear anaphylactic in nature because she is able to drive 30-minutes away for treatment without an EpiPen, which she refuses to use "because they hurt." She also does not take antihistamines such as Benadryl or Allegra. (Filing No. 8-2 at p. 26).

The ALJ also considered Plaintiff's mental condition. Plaintiff testified "she does not play well with others and she only does ok at the bakery because she is on her own," but has had limited mental health treatment. (Filing No. 8-2 at p. 26). The ALJ noted Plaintiff's August 2022 mental health assessment reflects emotional dysregulation, tangential thought, ups and down in emotion, and bizarre thinking, but observed Plaintiff's mental state "appears situational" due to distress and anger about the death of her husband and relationship with her children. (Id.).

The ALJ found Plaintiff "clearly has interaction issues," and observed Plaintiff's "bout of more significant mental complaint from May through June/July 2022" when she "appears delusional, anxious, angry, and very emotion about her past and current problems." The ALJ observed this as a "fairly isolated . . . short period of significant symptoms," and Plaintiff did not return for further sessions after her June 2022 appointment. (Filing No. 8-2 at pp. 26-27). The ALJ found Plaintiff was "unwieldy and emotional" in a psychological evaluation, she sometimes appears visibly irritated during medical appointments, and displays tangential thought processes and tells elaborate stories. Plaintiff "struggles to have social interactions with the younger people but she appears to do fine when she works by herself" and has been doing well with her part time

work.  The ALJ found there was "no objective evidence of significant deficiencies (if any) with regard to memory, understanding, concentration, attention, or overall cognition."  (Filing No. 8-2 at p. 27).

After consideration of the entire record and all Plaintiff's impairments, including anxiety disorder, unspecified somatic symptom disorder, histrionic personality disorder, and degenerative disc disease of the lumbar spine, the ALJ found Plaintiff is able to perform a range of medium work, with additional limitations.  Specifically, the ALJ found postural limitations were supported by her intermittent physical complaints, mild and conservative treatment, largely normal objective exam findings, and the claimant's wide range of daily activity.  The ALJ found there were no environmental limitations because Plaintiff can work in a bakery 20-25 hours per week and her medical record contains no documentation of allergy or intolerance to cleaning chemicals as she claims.  As for the claimant's mental limitations, the ALJ considered objective evidence of mood and emotional issues, anxiety, but accounted for those by limiting her interaction with others in the workplace.  (Filing No. 8-2 at p. 27).

In determining Plaintiff's RFC, the ALJ found the prior administrative findings of the state agency psychological consultant were generally persuasive because they were supported by the evidence and consistent with the record.  However, the ALJ found unpersuasive the state agency findings Plaintiff would have "difficulty" being punctual and present on the job; cannot have social interactions that are "too intense" or conflictual; or can only handle well-planned work changes, as such limitations were either vague or nonspecific, or conflicted with the record reflecting Plaintiff received a raise for work performance and attendance at her part time job.  (Filing No. 8-2 at p. 28).  The ALJ further found prior administrative findings of the state agency medical consultants were persuasive and consistent with the record reflecting Plaintiff is not overly limited in a significant way.  (Id.).

The ALJ found the opinion of the consultative examination performed by Matthew Hutt, PhD, was unpersuasive because he opined Plaintiff has "broadly and persistently impaired interpersonal and social functioning" and would have "difficulty with punctual attendance and consistent work," which were not supported by the record as a whole.  The ALJ did find "largely persuasive" the portion of Dr. Hutt's opinion that states Plaintiff is capable of "short, simple instructions because Plaintiff "appears to have interaction and mood regulation issues that would impact her understanding to some extent."  As such, the ALJ limited Plaintiff to "simple, routine

tasks, in keeping with the terms used by the Social Security Administration[.]" (Filing No. 8-2 at p. 28). The ALJ also considered a third-party Function Report from Plaintiff's mother, which the ALJ afforded similar weight because it is "fundamentally consistent" with Plaintiff's allegations. (Filing No. 8-2 at p. 29).

Considering Plaintiff's age, education, work experience, and RFC, the ALJ found there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, specifically: Cleaner (DOT 381.687-018, SVP 2, medium exertion level, approximately 200,000 jobs nationally); Laundry worker (DOT 361.684-010, SVP 2, medium exertion level, approximately 210,000 jobs nationally); and Dishwasher (DOT 318.687-010, SVP 2, medium exertion level, approximately 217,000 jobs nationally). (Filing No. 8-2 at pp. 29-30). The ALJ therefore found Plaintiff was not disabled under sections 202(e), 223(d), or 1614(a)(3)(A) of the Social Security Act.

In this appeal, Plaintiff contends remand is required because (1) although the ALJ found Dr. Hutt's opinion "largely persuasive" that Plaintiff is limited to "short, simple instructions," the ALJ's RFC finding "inexplicably limited [Plaintiff] to only simple and routine tasks" without explanation for this apparent conflict; and (2) the ALJ failed to account for Plaintiff's severe somatic symptom disorder in rendering his decision. (Filing No. 14 at pp. 3-4, 7-8).

## STANDARD OF REVIEW

After a claimant has sought review of an ALJ's decision by the Appeals Council, the claimant is entitled to judicial review of the ALJ's decision in federal district court. *Smith v. Berryhill*, 587 U.S. 471, 475 (2019); see also 42 U.S.C. § 405(g). Because the Appeals Council declined review, the ALJ's decision is the final decision of the Commissioner. See *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). On review, the district court determines "whether substantial evidence on the record as a whole supports the ALJ's decision." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009) (internal citation omitted)). Substantial evidence is "more than a mere scintilla," and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Under the substantial evidence standard, the district court will consider "evidence that detracts from the [ALJ's] decision, as well as evidence that supports it." *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) (citing *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007)). However, the district court will not reverse an ALJ's decision "simply because some evidence supports a conclusion other than that reached by the [ALJ]." *Id.* (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)). The district court must also affirm the ALJ's decision "[i]f, after reviewing the record, the [district] court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings." *Dols v. Saul*, 931 F.3d 741, 744 (8th Cir. 2019) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)). "'It is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo.'" *Dols*, 931 F.3d at 746 (8th Cir. 2019) (quoting *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007)). Nevertheless, the court's review is "more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp'" of the Commissioner's decision. *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (internal citations omitted).

## ANALYSIS

### I. Whether the ALJ Failed to Explain the Omission of the Persuasive Mental Medical Opinion of Record

Plaintiff first argues remand is necessary because although the ALJ found Dr. Hutt's opinion that Plaintiff was limited to "short, simple instructions" was "largely persuasive," the ALJ then "inexplicably" only limited Plaintiff to "simple, routine tasks" in the RFC and hypothetical question. Plaintiff argues the ALJ's failure to explain why he removed "short" from Dr. Hutt's persuasive finding "was a legally significant change to that limitation" requiring remand. (Filing No. 14 at pp. 3-4). The Commissioner counters that 1) the ALJ is free to accept some, but not all, of a medical opinion, and substantial evidence supported the ALJ's RFC determination; and 2) Plaintiff is "simply incorrect" that the ALJ's restriction to "simple and routine tasks" while omitting "short" subjects Plaintiff to perform jobs involving instructions "potentially unlimited in length" and "tasks with a potentially unlimited number of steps." (Filing No. 19 at pp. 4-7).

Plaintiff relies on two Fourth Circuit cases, *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019) and *Lawrence v. Saul*, 941 F.3d 140 (4th Cir. 2019) to assert that "simple instructions and

25

short instructions are not the same thing," and "[a] limitation to handling 'short instructions' is inconsistent with the ability to carry out detailed, but uninvolved instructions, as is found in occupations with a reasoning level of 2." (Filing No. 14 at p. 5) (citing *Lawrence*, 941 F.3d at 143). Level 1 Reasoning requires a worker to "[a]pply commonsense understanding to carry out one- or two-step instructions" and to "[d]eal with standardized situations with occasional or no variables in or from those situations encountered on the job." Dictionary of Occupational Titles app. C, III (4th ed. 1991)). Level 2 Reasoning requires a worker to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized situations." *Id.*

In *Thomas,* the Fourth Circuit "found an apparent conflict between the claimant's residual functional capacity, which limited her to jobs involving 'short, simple instructions,' and Level 2's concept of 'detailed but uninvolved instructions.'" 916 F.3d at 313-14. In contrast, the Fourth Circuit in *Lawrence* found no apparent conflict between the ALJ's finding that a claimant could perform jobs limited to "simple, routine repetitive tasks of unskilled work" and Level 2 reasoning jobs' notions of "detailed but uninvolved . . . instructions" and tasks with "a few [ ] variables." 941 F.3d at 143 (observing "tasks" and "instructions" are not necessarily always synonymous) (quoting DOT, App. C, 1991 WL 688702); see also *Galloway v. Kijakazi*, 46 F.4th 686, 690 (8th Cir. 2022) ("The Eighth Circuit has previous found 'no direct conflict between carrying out simple job instructions for simple, routine and repetitive work activity,'" and a 'vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate.'"); *Moore v. Astrue*, 623 F.3d 599 (8th Cir. 2010) (concluding a claimant limited to "carrying out simple job instructions" and to performing "simple, routine and repetitive work activity at the unskilled task level" may be able to perform work requiring Level 2 Reasoning); *Thomas v. Berryhill*, 881 F.3d 672, 677 (8th Cir. 2018) (noting that the reasoning level requirements listed in the DOT are "simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range.").

The undersigned magistrate judge is not entirely convinced that there is an actual conflict between Dr. Hutt's opinion that Plaintiff is "likely capable of handling short, simple instruction sets under ordinary supervision" and the ALJ's limitation of Plaintiff to "perform simple and routine tasks" and "medium, unskilled jobs." There is also no apparent conflict between the ALJ's formulation of Plaintiff's RFC and the opinions he found persuasive. The ALJ limited Plaintiff to

performing "simple and routine tasks," in part based on Dr. Hutt's "largely persuasive" opinion that Plaintiff would be able to carry out "short, simple instructions." The ALJ found that opinion persuasive after specifically observing that Plaintiff "appears to have interaction and mood regulation issues that would impact her understanding to some extent." The ALJ otherwise observed, "There is little if any objective evidence of significant deficiencies with regard to memory, understanding, concentration, attention, or overall cognition," (Filing No. 8-2 at p. 23), an observation that is thoroughly supported by the other persuasive opinions and evidence in the record. Dr. Hutt himself opined Plaintiff's attention, concentration, and intellectual capacities are all intact; his areas of limitation were derived from his opinion that Plaintiff is impaired in social functioning and her ability to relate appropriately to coworkers and supervisors. Moreover, Dr. Hutt did not explicitly opine Plaintiff is limited in her ability to carry out detailed instructions or lengthy instructions—just that she "is likely capable of handling short, simple instruction sets under ordinary supervision," and that "[t]his domain remains residually intact." (Filing No. 9-1 at p. 369).

The ALJ also found the prior administrative findings of the state agency medical consultants were persuasive; these findings likewise provided Plaintiff had no limitations in understanding and memory, was "not significantly limited" in her ability to carry out very short and simple instructions, there was "no evidence of limitation" in her ability to carry out detailed instructions, and she was not significantly limited in her ability to maintain attention and concentration for extended periods. Similar to Dr. Hutt's observations, the agency consultants found Plaintiff was "moderately limited" in the ability to interact appropriately with the general public, the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and the ability to accept instructions and respond appropriately to criticism from supervisors. The state agency consultants noted, "Her tolerance of stress and changes is reduced to some degree, but she is able to handle relatively well planned changes in an ordinary work setting." (Filing No. 9-1 at p. 369-70).

The ALJ considered the above opinions, as well as the rest of the record and objective evidence regarding Plaintiff's mood and interaction issues, and accounted for those areas of limitation by formulating an RFC providing she should only interact with coworkers occasionally, and cannot interact with the public as part of her regular job duties. Those limitations, in combination with limiting Plaintiff to "simple and routine tasks" account for the

limitations found credible by the ALJ. The ALJ was not required include a limitation to "short instructions" in his RFC assessment. The ALJ evaluated the relative persuasiveness of each of the medical opinions as required under the applicable regulations. See *Bowers v. Kijakazi*, 40 F.4th 872, 875 (8th Cir. 2022) (citing 20 C.F.R. § 404.1520c(a)). Where a single medical source offers multiple opinions, the ALJ is not required to discuss each opinion individually, but instead may address all of the source's opinions "together in a single analysis." 20 C.F.R. §§ 404.1520c(b)(l), 416.920c(b)(l). Moreover, this court's deferential standard of review precludes "labeling findings inconsistent if they can be harmonized." *Galloway v. Kijakazi*, 46 F.4th 686, 690 (8th Cir. 2022) (quoting *Chismarich v. Berryhill*, 888 F.3d 978, 980 (8th Cir. 2018) (per curiam)). The ALJ's RFC incorporates limitations that are supported by substantial evidence in the record, and thus the undersigned magistrate judge finds the ALJ did not err by failing to expressly include a restriction to "short instructions" in Plaintiff's RFC or otherwise explicitly reject such limitation. See *McCoy v. Astrue*, 648 F.3d 605, 615 (8th Cir. 2011) ("We review the record to ensure that an ALJ does not disregard evidence or ignore potential limitations, but we do not require an ALJ to mechanically list and reject every possible limitation").

## II.    Whether the ALJ Failed to Account for Plaintiff's Severe Somatic Symptom Disorder in Rendering His Decision

Plaintiff next argues remand is required because the ALJ found Plaintiff suffered from severe somatic symptom disorder, but then but failed to properly account for or acknowledge that impairment in his analysis and discussion of the evidence. (Filing No. 14 at pp. 8-11). The Commissioner counters that the ALJ "explicitly stated that he carefully considered the entire record before making his RFC determination" and an "ALJ is not required to discuss every piece of evidence"; the ALJ did discuss the evidence addressing Plaintiff's allergy symptoms and that Plaintiff reported improvement in her symptoms after taking allergy medications; and Plaintiff fails to prove, or even identify, specific work-related limitation she argues the ALJ should have assessed. (Filing No. 19 at pp. 9-10).

In this case, the ALJ found Plaintiff had severe impairments of anxiety disorder, unspecified somatic symptom disorder, histrionic personality disorder, and degenerative disc disease of the lumbar spine. The Social Security Listing of Impairments describe somatic symptom and related disorders (12.07) as follows:

These disorders are characterized by physical symptoms or deficits that are not intentionally produced or feigned, and that, following clinical investigation, cannot be fully explained by a general medical condition, another mental disorder, the direct effects of a substance, or a culturally sanctioned behavior or experience. These disorders may also be characterized by a preoccupation with having or acquiring a serious medical condition that has not been identified or diagnosed. Symptoms and signs may include, but are not limited to, pain and other abnormalities of sensation, gastrointestinal symptoms, fatigue, a high level of anxiety about personal health status, abnormal motor movement, pseudoseizures, and pseudoneurological symptoms, such as blindness or deafness.

20 C.F.R. § Pt. 404, Subpt. P, App. 1.  "Subjective perceptions of somatoform effects may, in fact, be debilitating even when clinical or diagnostic medical evidence does not fully support the claimed symptoms." *Nowling v. Colvin*, 813 F.3d 1110, 1114 (8th Cir. 2016).  "In cases involving somatoform disorder . . . an ALJ is not free to reject subjective experiences without an express finding that the claimant's testimony is not credible." *Metz v. Shalala*, 49 F.3d 374, 377 (8th Cir. 1995).  But where the ALJ makes such a finding, "the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints [will not be disturbed] . . . even in cases involving somatoform disorder." *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).

Plaintiff asserts the ALJ did not address Plaintiff's severe somatic symptom disorder, its symptoms, or any treatment she received in connection with that impairment "in spite of multiple medical providers suggesting that [Plaintiff's] chronic allergies were a result of her impaired mental state and somatic preoccupation" and "ignored the implications of [Plaintiff's] somatic symptom disorder on her overall functioning."  (Filing No. 14 at pp. 5, 8). Plaintiff contends the ALJ unreasonably attributed Plaintiff's "uncontrolled" allergies to her treatment noncompliance rather than considering whether they were the product of her somatic symptom disorder.  (Filing No. 14 at p. 9).

Contrary to Plaintiff's assertions that the ALJ "never acknowledged" that Plaintiff's unsubstantiated allergies "were actually related to her somatic symptoms disorder," the ALJ specifically recognized Plaintiff's providers "do not seem to believe her reactions are related to allergies" and that they "have attributed [Plaintiff's] issues more to anxiety than an actual allergy."  The ALJ also specifically discussed that the severity of Plaintiff's mental impairments do not meet or medically equal the criteria of the pertinent listings, including 12.07 (somatic symptom disorder).  (Filing No. 8-2 at p. 22).  In making that finding, the ALJ considered whether

paragraph B criteria are satisfied (whether Plaintiff's mental impairments result in one extreme limitation or two marked limitations in a broad area of functioning), and found they was not. The ALJ found Plaintiff did not have marked or extreme limitations in any of these broad areas of functioning because Plaintiff has "wide range of daily activity," works part-time in the bakery (and recent treatment notes indicated she felt work was going well and had received a raise for performance and attendance), cares for two dogs, prepares her own food, lives on her own, cares for her own laundry and household, drives, shops in stores, and spends time with friends, has hobbies such as crafts, and there was no objective evidence of significant deficiencies as to her memory, understanding, concentration, attention, or overall cognition. (Filing No. 8-2 at p. 23).

The ALJ also accurately noted Plaintiff's mental health treatment was "overall limited" and that clinic notes indicate she has previously refused to take antidepressants/antipsychotics. Plaintiff has also "strongly disagreed" with any of her medical provider's suggestions that her allergy symptoms could be related to anxiety. See, e.g., Filing No. 9-1 at pp. 96-97. The ALJ went on to state that, as to Plaintiff's mental limitations, he specifically considered the "objective evidence of mood and emotional issues, anxiety, and [Plaintiff's] alleged subjective symptoms including difficulty around others." (Filing No. 8-2 at p. 27). The ALJ also recognized that Plaintiff has been able to work in the bakery, shop in stores, has received minimal mental health treatment over all, and the "largely unremarkable mental findings of record." The ALJ also recognized Plaintiff's "emotional and interaction issues," but accounted for that by limiting her interaction with others in the workplace and with the public. (Filing No. 8-2 at p. 26).

Plaintiff has not pointed to evidence in the record supporting an inference that the ALJ erred in assessing her limitations or that the RFC otherwise does not account for her proven limitations. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." *Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003) (citing *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)). A claimant's RFC determination is "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations." *Schmitt v. Kijakazi*, 27 F.4th 1353, 1360 (8th Cir. 2022) (quoting *Hensley v. Colvin*, 829 F.3d 926, 931-32 (8th Cir. 2016) (citation omitted). "'Because a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace'[;][h]owever, there is no requirement that an RFC finding be supported by a

specific medical opinion." *Id.* (quoting *Hensley*, 829 F.3d at 932).

At its core, Plaintiff's argument suggests the ALJ disregarded certain evidence, and incorrectly evaluated or weighed other evidence; however, "'It is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo.'" *Dols*, 931 F.3d at 746 (quoting *Cox*, 495 F.3d at 617). Here, the ALJ recognized Plaintiff has some physical and mental limitations due to her mental and physical impairments. The ALJ's RFC accounted for Plaintiff's impairments as outlined above by limiting Plaintiff to performing medium work with certain postural limitations, limiting her to simple and routine tasks, limiting her to interaction with coworkers occasionally, and without interaction with the public as part of her regular job duties. See *Schmitt*, 27 F.4th at 1360 (providing a claimant's RFC determination is "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations" and "must be supported by some medical evidence of the claimant's ability to function in the workplace'"). The vocational expert identified jobs Plaintiff could perform despite these limitations. The issue for the Court's review is simply "whether substantial evidence supports the ALJ's decision," and in this case, the undersigned magistrate judge finds the ALJ's decision was supported by substantial evidence. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010) (citing *Young*, 221 F.3d at 1068).

In sum, the undersigned magistrate judge finds and concludes there is substantial evidence to support the ALJ's RFC determination and finding that Plaintiff is not disabled. The ALJ properly considered the evidence of record, including the medical and opinion evidence, in formulating Plaintiff's RFC. The reviewing court must affirm the ALJ's decision if, after reviewing the record, "it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings." *Dols*, 931 F.3d at 744. The reviewing court also may not reverse the ALJ "simply because some evidence supports a conclusion other than that reached by the [ALJ]." *Fentress,* 854 F.3d at 1020. Because the undersigned magistrate judge finds substantial evidence supports the ALJ's decision, he recommends that the ALJ's decision be affirmed. Upon consideration,

**IT IS HEREBY RECOMMENDED** to the Honorable John M. Gerrard, Senior United States District Court Judge, that:

31

1. Plaintiff's Motion for Order Reversing Decision of the Commissioner (Filing No. 13) be denied; and

2. The Commissioner's Motion to Affirm Commissioner's Decision (Filing No. 18) be granted.

Dated this 21st day of July, 2025.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

## ADMONITION

A party may object to a magistrate judge's findings and recommendation by filing an objection within fourteen (14) days after being served with a copy of the findings and recommendation. NECivR 72.2. Failure to timely object may constitute a waiver of any objection.